IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JOHAN NORRMAN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KBR, INC., STUART J. B. BRADIE, and MARK W. SOPP,<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Johan Norrman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding KBR, Inc. ("KBR" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

## NATURE OF THE ACTION

---

[1] Unless otherwise stated, all emphasis is added.

1

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded KBR securities between May 6, 2025 and June 19, 2025, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased KBR securities during the Class Period and was economically damaged thereby.

7. Defendant KBR states that it delivers "science, technology and engineering solutions to governments and companies around the world."

8. Pertinent to this action is HomeSafe Alliance ("HomeSafe"), a KBR joint venture in which KBR has a 72% economic interest. Prior to the Class Period, HomeSafe had been awarded the Global Household Goods Contract by the U.S. Department of Defense's Transportation Command ("TRANSCOM"), which helps U.S. military service members and their families relocate.

9. Defendant KBR is incorporated in Delaware and its head office is located at 601 Jefferson Street, Suite 3400, Houston, Texas, 77002. KBR securities trade on the New York Stock Exchange (the "NYSE") under the ticker symbol "KBR."

10. Defendant Stuart J. B. Bradie ("Bradie") served as the Company's President and Chief Executive Officer ("CEO") at all relevant times.

11. Defendant Mark W. Sopp ("Sopp") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") at all relevant times.

12. Each of the Individual Defendants:

   (a) directly participated in the management of the Company;

   (b) was directly involved in the day-to-day operations of the Company at the highest levels;

   (c) was privy to confidential proprietary information concerning the Company and its business and operations;

   (d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

3

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

13. KBR is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to KBR under *respondeat superior* and agency principles.

15. Defendant KBR and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading Statements Issued During the Class Period

16. On May 6, 2025, before the market opened, KBR held its earnings call for the first quarter of 2025 (the "Q1 Call"). Defendant Bradie made the following statement on the Q1 Call:

> On to slide 6. I will start with an update on our key contracts and recent wins. **Starting with HomeSafe, our contract continued to ramp during Q1, and we saw significant operational improvement throughout the quarter**. Our mission is to improve the move experience of the servicemen and women, while saving taxpayer money as we replace the inefficient and costly legacy program.
>
> **We are making solid progress against these objectives with customer satisfaction rising nicely**. As we move into the summer peak season, we continue to work with Transcom to synchronize moves to supplier capacity. **But this synchronization is healthy for the**

*long-term program as it emphasizes quality and timeliness of the moves first*.

We accordingly expect pace of move growth to be modest in Q2 with incremental step-ups in Q3 and Q4. *The HomeSafe-Transcom relationship is strong with a commitment on both sides to make this program successful.*

17.     He further stated:

*Regarding revenue, as we previously stated, our guide included an estimated revenue range for HomeSafe of $300 million to $500 million for this year*. As Stuart mentioned, we expect the pace of move growth to be modest in Q2 with incremental step-ups in Q3 and Q4, and we'll provide an update on the ramp in our next Q2 call in late July.

18.     Defendant Sopp made the following statement:

*Regarding revenue, as we previously stated, our guide included an estimated revenue range for HomeSafe of $300 million to $500 million for this year. As Stuart mentioned, we expect the pace of move growth to be modest in Q2 with incremental step-ups in Q3 and Q4*, and we'll provide an update on the ramp in our next Q2 call in late July. Additionally, within the greater macro, one of the areas of uncertainty continues to be the level of troop support in Eastern Europe.

19.     The Q1 Call included the following exchange between Defendant Bradie and an analyst from UBS named Steven Fisher:

**Steven Fisher**: Okay. That's helpful. *And then, again, not sure if I missed this, but in terms of HomeSafe, just how would you characterize the scope of the work that you're going to be capturing during the peak moving season here?* And how much that could still shift around as the next few months unfold?

**Defendant Bradie:** Good question, Steve. It is seasonal, as you're aware. We said in our prepared remarks, we expect volumes in Q2 to be kind of similar to Q1 with increases going into Q3 and again into Q4. *We are very happy with the performance on HomeSafe*. Again, we covered that in our prepared remarks, the customer satisfaction rates are up. And remember, that's the primary objective is to improve the move experience for the service men and women.

The second objective is to save the taxpayers money, and we are achieving that also. *So we're very happy with how things are going. The relationship with Transcom is excellent and we look forward to progressing with what is a fantastic transformational program* deploying IT at scale, using a lot of digital tools and really transforming an industry to be more efficient and more accountable as we go forward. So feeling really good about where HomeSafe sits today.

20.    The Q1 Call included the following exchange between Defendant Bradie and an analyst from Goldman Sachs named Jerry Revich:

**Jerry Revich**: Hi. Stuart, *can you just expand on the progress that you folks are making on HomeSafe? You mentioned improving customer satisfaction scores. Can you just quantify how that's trending?* And also, can you just give us an update, please, on vendor sign-ups? How is that going relative to plan and relative to the ultimate target of moves on a multiyear basis?

**Defendant Bradie:** *Customer satisfaction has increased to just under 90%, is the number we've achieved to date and -- but it has increased markedly over week -- over the past several weeks.* The main reason for that is the adoption of the technology. We put a lot of effort into training drivers and as well as the companies who utilize the technology. And as a consequence of that, our adoption by suppliers is increasing. *At the same time, we've really put a lot of effort into our customer care service and increased the level of staffing and training from our side into that capability, and that's proving a real winner with the service men and women*. We have not computers or robots that answer the phone, but real people that help them with whatever issue they may have.

And the other part to this is that there are always issues in moving. Anyone who's at all moved on this call, I'm sure. *And there's always issues, but we have settled 100% of all of the claims on time, as it relates to any discontent or anything that's been damaged, et cetera, by the movers themselves*. So I think all up, I think that's what's driving the performance and customer satisfaction.

*We put a lot of effort, Jerry, into synchronizing moves with Transcom and really making sure that we don't impact service members, making sure we've got the supply chain to actually execute the moves and our capacity continues to increase.* And as we head into the peak season, or the busy season, or summer season as some call it, there are different dynamics during that season, *and we're working daily with Transcom to make sure the right decisions are made by this for the service members. That's our priority.*

*So I think we are very much lockstep with Transcom*. Transcom went to Congress and the HSM Service Committee [ph] recently and reaffirmed their commitment to the program and have done so publicly and politically, and we are absolutely in lockstep with them in that commitment. *And as I said in my other statement, we are very confident in the future of this program.*

21.    The statements contained in ¶¶ 16-20 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly

6

disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Despite the knowledge that the U.S. Department of Defense's Transportation Command (TRANSCOM) had, for months, had material concerns with HomeSafe's ability to fulfill the Global Household Goods Contract, Defendants claimed that the partnership was without issue, and would ramp up in future quarters; and (2) as a result, Defendants' statements about KBR's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

22.     On June 19, 2025, after the market closed, HomeSafe issued a press release entitled "HomeSafe Alliance announces TRANSCOM's Notice to Terminate Global Household Goods Contract." The press release stated, in pertinent part, the following, revealing that there had been issues between TRANSCOM and HomeSafe for months:

> [HomeSafe] received on June 18, 2025, a notice from the U.S. Department of Defense's Transportation Command (TRANSCOM) ***terminating the Global Household Goods Contract***, which HomeSafe won in 2021 to transform the military move system for the benefit of service members and their families.
>
> ***HomeSafe is confident it performed to the fullest extent possible considering the limitations placed on it***. HomeSafe ***disagrees with TRANSCOM's justification for terminating the program.***
>
> Though HomeSafe will be ceasing operations, it will first complete all moves currently in progress for service members and their families.
>
> \*     \*     \*
>
> TRANSCOM created the Global Household Goods Contract at the direction of Congress to modernize the military move system after years of complaints from service members, their families and veterans. ***HomeSafe has worked in good faith with TRANSCOM for several months to address government delays, obstacles and commercial challenges***. Indeed, as of a few weeks ago, ***TRANSCOM and HomeSafe had reached an agreement to resolve these issues and move the program forward.*** HomeSafe is disappointed that it did not have the opportunity to engage with the Permanent Change of Station Joint Task Force prior to the contract being terminated without warning.

> *From the program's start, HomeSafe also has faced staunch opposition from certain legacy movers. HomeSafe is considering all legal options available to it.*

23. The next day, before market hours, KBR issued a press release entitled "KBR Announcement on HomeSafe Alliance Global Household Goods Contract." It stated the following:

> HomeSafe Alliance, a KBR (NYSE: KBR) Joint Venture, informed us on June 18, 2025, that U.S. Transportation Command (TRANSCOM) has terminated HomeSafe's role in the Global Household Goods Contract, a contract designed to improve the moving system for military service members and their families.
>
> ***We have been and will continue to work with HomeSafe to complete its obligations*** to TRANSCOM and the military service members and families that it serves.

24. On this news, the price of KBR stock fell $3.85 per share, or 7.29%, to close at $48.93 on June 20, 2025. On June 23, 2025, the next trading day, KBR stock fell a further $1.30, or 2.65%, to close at $47.63 on June 23, 2025.

25. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

26. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired KBR securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of KBR, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

8

27. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, KBR securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

28. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

29. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

30. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of KBR;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused KBR to issue false and misleading filings during the Class Period;

9

- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of KBR securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

31. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

32. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- KBR shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;
- As a public issuer, KBR filed periodic public reports;
- KBR regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- KBR' securities were liquid and traded with moderate to heavy volume during the Class Period; and

- KBR was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

33. Based on the foregoing, the market for KBR securities promptly digested current information regarding KBR from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

34. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

35. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

36. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

37. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

38. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of KBR securities during the Class Period.

39. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of KBR were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of KBR, their control over, and/or receipt and/or modification of KBR' allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning KBR, participated in the fraudulent scheme alleged herein.

40. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other KBR personnel to members of the investing public, including Plaintiff and the Class.

41. As a result of the foregoing, the market price of KBR securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of KBR securities during the Class Period in purchasing KBR securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

42. Had Plaintiff and the other members of the Class been aware that the market price of KBR securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased KBR securities at the artificially inflated prices that they did, or at all.

43. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

44. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of KBR securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

45. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

46. During the Class Period, the Individual Defendants participated in the operation and management of KBR, and conducted and participated, directly and indirectly, in the conduct of KBR' business affairs. Because of their senior positions, they knew the adverse non-public information about KBR's business practices.

47. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to KBR' financial condition and results of operations, and to correct promptly any public statements issued by KBR which had become materially false or misleading.

48. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which KBR disseminated in the marketplace during the Class Period concerning KBR' results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause KBR to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of KBR within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of KBR securities.

49. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by KBR.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

<b><u>JURY TRIAL DEMANDED</u></b>

Plaintiff hereby demands a trial by jury.

Dated: September 19, 2025

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
/s/ Phillip Kim
Phillip Kim, Esq., attorney-in-charge
Bar Number: 1036827
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
lrosen@rosenlegal.com

*Counsel for Plaintiff*