**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| JOHAN NORRMAN, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> KBR, INC., STUART J.B. BRADIE, and MARK W. SOPP, <br><br> Defendants. | **Case No: 4:25-cv-04464** <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Lead Plaintiff Johan Norrman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding KBR, Inc. ("KBR" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

---

[1] Unless otherwise stated, all emphasis is added.

1

**NATURE OF THE ACTION**

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded KBR common stock between May 6, 2025 and June 19, 2025, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     This action arises from materially false and misleading statements that Defendant Stuart J.B. Bradie ("Bradie"), the President and Chief Executive Officer of KBR, Inc. ("KBR" or the "Company"), made concerning the performance and viability of the Global Household Goods Contract ("GHC"), a multi-billion-dollar Department of Defense relocation program administered through HomeSafe Alliance LLC ("HomeSafe"), a joint venture in which KBR holds a controlling economic interest." During the Class Period, Bradie assured investors that the HomeSafe program was ramping successfully, that operational performance and customer satisfaction were improving, and that HomeSafe maintained a strong working relationship with the U.S. Department of Defense's Transportation Command ("TRANSCOM"). In reality, the program was experiencing severe operational deficiencies—including lacking sufficient subcontractor capacity to handle the moves,  persistent failures to meet required performance metrics, and escalating governmental scrutiny—that placed the contract at serious risk of termination.

3.     The Global Household Goods Contract was a major strategic initiative for KBR and an important component of the Company's long-term growth narrative. Awarded to HomeSafe in 2021, the contract had a potential ceiling value of approximately $20 billion over a possible 9.5-year term. Because KBR holds a 72% economic interest in HomeSafe and

consolidates its financial results, the program represented a significant anticipated source of revenue, leading investors and securities analysts to closely follow its performance.

4.     Before the start of the Class Period, however, the HomeSafe program encountered increasing operational challenges as it attempted to scale its operations. Homesafe repeatedly delayed the rollout of the program, struggled to build sufficient capacity to perform assigned moves, and faced increasing scrutiny from government officials and industry participants regarding its ability to successfully execute the contract. These issues created uncertainty among investors about whether the program would ultimately achieve the operational scale KBR had projected.

5.     Against this backdrop, Bradie used KBR's May 6, 2025 first-quarter earnings call to address investor concerns regarding the HomeSafe program and reassure the market that the program had overcome earlier difficulties and was successfully ramping operations. During the call, Bradie stated that the program had experienced "significant operational improvement" during the quarter and that customer satisfaction scores were "rising nicely." He further assured investors that HomeSafe's operational capacity and supplier adoption were increasing, that move volumes were expected to grow as the year progressed, and that the relationship between HomeSafe and the U.S. Department of Defense's Transportation Command ("TRANSCOM") was strong and aligned in supporting the program's success. Bradie presented these developments as evidence that the HomeSafe program was back on track as it entered the peak military moving season. These assurances, however, were false, and belied by the facts.

6.     In truth, the HomeSafe program was experiencing serious operational failures during the Class Period. HomeSafe's network of subcontracted movers was insufficient and unwilling to perform assigned shipments at the contracted rates. HomeSafe therefore repeatedly

failed to satisfy key contractual performance indicators governing shipment scheduling, pickup, and delivery, and faced mounting concern and intervention from Department of Defense officials regarding its ability to perform under the contract. These undisclosed problems significantly impaired HomeSafe's ability to execute the program and created a substantial risk that the Global Household Goods Contract would be curtailed or terminated.

7.      The truth was revealed on June 19, 2025, when HomeSafe disclosed that TRANSCOM had terminated the Global Household Goods Contract. Following this announcement and related disclosures, the price of KBR stock fell $3.85 per share, or 7.29%, to close at $48.93 on June 20, 2025. On June 23, 2025, the next trading day, KBR stock fell a further $1.30, or 2.65%, to close at $47.63 on June 23, 2025.

**JURISDICTION AND VENUE**

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

10.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because KBR is headquartered in this District and substantial parts of the acts and omissions alleged herein—including the preparation and dissemination of the challenged statements and SEC filings—occurred in this District.

11.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of

4

interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES AND IMPORTANT NON-PARTIES

12. Plaintiff, as set forth in the previously filed certification incorporated by reference herein, purchased KBR common stock during the Class Period and was economically damaged thereby.

13. Defendant KBR states that it delivers "science, technology and engineering solutions to governments and companies around the world."

14. Defendant KBR is incorporated in Delaware and its head office is located at 601 Jefferson Street, Suite 3400, Houston, Texas, 77002. KBR securities trade on the New York Stock Exchange (the "NYSE") under the ticker symbol "KBR."

15. Defendant Stuart J.B. Bradie ("Bradie") served as the Company's President, Chief Executive Officer ("CEO") and Director since 2014.

16. Defendant Mark W. Sopp ("Sopp") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since February 2017.

17. Each of the Individual Defendants:

    (a) directly participated in the management of the Company;

    (b) was directly involved in the day-to-day operations of the Company at the highest levels;

    (c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

18. KBR is liable for the false and misleading statements alleged herein because those statements were made, signed, approved, and/or disseminated by KBR acting through its senior officers and through KBR's SEC filings, earnings releases, and investor communications.

19. Defendant KBR and the Individual Defendants are collectively referred to herein as "Defendants."

20. Non-party HomeSafe Alliance ("HomeSafe") is a KBR joint venture in which KBR has a 72% economic interest. Prior to the Class Period, HomeSafe had been awarded the Global Household Goods Contract by the U.S. Department of Defense's Transportation Command ("TRANSCOM"), which helps U.S. military service members and their families relocate.

## COMPANY BACKGROUND

21. Originally formed through the merger of the MW Kellogg Company and Brown & Root, the current iteration of KBR went public in November of 2006 as a spin off from its

former parent company, Halliburton. It provides engineering, logistics, and professional advisory services to governments and private companies.

## HOMESAFE PROGRAM BACKGROUND

22.     The Department of Defense's household goods moving program—historically operated through the Defense Personal Property Program ("DP3")—has long relied on a "Tender of Service" ("ToS") model under which multiple moving companies perform DP3 shipments. The Department of Defense is the largest customer in the nation's personal property moving and storage industry and represents approximately 15% of all domestic and international moves, amounting to roughly 300,000 shipments per year at an annual cost of $2 billion.

23.     In response to years of dissatisfaction with DP3 performance and servicemember complaints, U.S. Transportation Command ("TRANSCOM" or "USTRANSCOM") created the Global Household Goods Contract ("GHC") to shift move management to a single prime contractor responsible for coordinating shipments and service-provider performance, while the military services retained roles counseling customers and monitoring performance.

24.     In 2019, KBR formed a joint venture with Tier One Relocation known as HomeSafe Alliance LLC ("HomeSafe"). In its SEC filings, KBR disclosed that it holds a 72% interest in HomeSafe and that HomeSafe is a variable interest entity ("VIE") for which KBR is the primary beneficiary, and therefore KBR consolidates HomeSafe in its financial statements.

25.     On November 4, 2021, TRANSCOM announced that HomeSafe was awarded an exclusive long-term contract to be the global household goods move-management service provider for the US Armed Forces, Department of Defense civilians, and their families for a term up to 9.5 years. This caused KBR stock's price to increase $2.10 per share or 5.3% over a

two-day period. KBR reported the ceiling value of the contract at $20 billion over the 9.5 year life of the contract. Therefore, KBR's 72% share in HomeSafe amounted to revenue potential of $14.4 billion over the life of the contract, or approximately $1.5 billion per year. By comparison, KBR's total revenues for the year ending December 29, 2023 was $6.956 billion, meaning that HomeSafe had the ability to increase KBR's revenue by more than 20%. In a press release on March 14, 2022, announcing a conference call to discuss the impact of the HomeSafe contract on 2025 earnings, KBR stated that "KBR delivered a terrific year in 2021, and the global household goods contract award and updated 2025 outlook reflect the continued momentum in our business and significant value creation opportunities for our shareholders."

26.    After the Government Accountability Office "GAO" denied legal challenges by competing bidders, the US Transportation Command ("TRANSCOM") announced the beginning of implementation of the HomeSafe contract, starting with a nine month transition period. However, due to implementation delays, HomeSafe did not begin handling moves until the summer of 2024, initially handling only 50 moves per month, according to a Department of Defense Press Release dated June 4, 2024.

27.    According to the GAO, in a September 2025 report titled "Military Moves – DOD Needs Better Information to Effectively Oversee Relocation Program Efforts" (the "GAO Report"), the plan as of January 2024 was to begin shipments in April 2024, with 100% implementation by December of 2024. In October 2024 the timeline for full implementation was pushed to Spring 2025. However, as of February 2025, the plan was pushed back further, with 20% implementation by May 2025 and 50% implementation by August 2025, with no date set for 100% implementation. By May 2025 the plan was for implementation to remain at 10% through at least August 2025.

28.    HomeSafe's contract with the government contemplated that HomeSafe would conduct its moves through a network of subcontractor moving companies. However, throughout the contract, HomeSafe had an insufficient number of subcontractors signed up for the service. The GAO Report attributed this problem to HomeSafe offering a lower than standard rate for movers. According to the Military Times, in a March 7, 2025 article entitled "Moving headaches lead military to slow new household shipping program", rates for HomeSafe were 20-30% lower than the legacy system. Moving industry associations and companies reported to the GAO that the rates HomeSafe offered were too low to cover the costs of doing business. The GAO also noted that HomeSafe misrepresented its actual capacity to TRANSCOM.

29.    FE-1, a HomeSafe Alliance Vice President of International Operations from February 2023 through November 2024, who reported directly to HomeSafe COO Bill Hughes, was asked upon being hired to create various forecasts for HomeSafe's international business. Based on FE-1's analysis, FE-1 concluded that it would be "impossible to successfully execute" the GHC with respect to international permanent change of station ("PCS") moves. FE-1 stated that FE-1 held this belief throughout the duration of FE-1's employment. FE-1's analysis showed that it would be more expensive for HomeSafe to execute international moves than the federal government had agreed to pay HomeSafe when the GHC was executed. "If you bill the government less than it costs you to perform a service," FE-1 summarized, "then you will not make any money." FE-1 attributed this problem to the fact that the GHC contract was awarded to HomeSafe based on 2019 shipping rates, that had become untenable in the wake of inflation in the years after the COVID-19 pandemic. Beginning in around March 2023, FE-1 began discussing FE-1's concerns that the math did not work and prepared Excel sheet models and PowerPoint slides to showing this. FE-1 informed Bill Hughes and other executives of this and

recalled presenting analyses detailing the unprofitability of the GHC to Bill Hughes, Chief Commercial Officer Paul Wallace and CEO Alan Thompson during a conference call that occurred around June or July of 2023. Before the call, Hughes told FE-1 that "Al [Thompson] needs to know what we're facing on this." After FE-1 presented the analysis during the conference call, Thompson lamented, "Why haven't I heard about this before?"  In subsequent conversations with Bill Hughes and other executives (including Matt Dolan and Paul Wallace), FE-1 suggested that HomeSafe needed to study the market and find out what the standard market prices were that vendors were willing to agree to. However, the executives forbade FE-1 from doing so because HomeSafe did not want information about what it could pay vendors "flowing into the marketplace." Ultimately, in the summer of 2024, FE-1 was allowed to solicit bids for Alaska, but not a single potential vendor agreed to the pricing HomeSafe would need to have in place to make any profit. The bids they received were "40 to 50 percent higher than what we could offer."

30.    HomeSafe's execution of the GHC also suffered from poor performance issues, as defined by TRANSCOM's performance requirements. TRANSCOM monitored performance through nine key performance indicators which were defined in the contract, "including metrics for timeliness of shipment scheduling, pickup, and delivery, and customer satisfaction". Transcom tracked these metrics every month, and found that throughout 2025, HomeSafe failed to meet defined performance thresholds for most key performance indicators.  The GAO reported that from January through June of 2025, HomeSafe only picked up 64% of shipments on time, and delivered 58% of shipments on time. From April 2024 through June 2025, TRANSCOM terminated about 7,400 orders due to HomeSafe's "failure to meet performance requirements or lack of capacity to manage the shipments."

10

31.    In January of 2025, the Department of Defense issued a formal "show cause" notice to HomeSafe to explain hundreds of instances during January in which movers failed to begin moves on the scheduled dates or delivered belongings late. At the time, while TRANSCOM attributed the shortfall to a lack of moving capacity (i.e. an insufficient number of subcontractors willing to perform the moving services), HomeSafe attributed the problems, at least in part, to an internal logistics error within a subcontractor. According to the Federal News Network's January 30, 2025 article "DoD raises formal performance concerns on multibillion dollar moving contract", TRANSCOM's Director of Acquisition, Ken Brennan, told reporters that the show cause notice was "predominantly related to those missed pickups, and those are driven by their ability to access [moving industry] capacity," (brackets in original). Brennan went on to state that "The going-in position was that they had to have the ability to make the moves as we farm them to them, and when they did not deliver, we asked them, 'Where is that capacity? How are you getting that capacity?' That is an ongoing conversation … we are talking daily to ensure that they're building that capacity." (ellipses in original).

32.    At the same time, Military.com reported that military families were reporting delays and cancellations while attempting to use the HomeSafe moving program.

33.    By February 14, 2025, the U.S. Department of Defense acknowledged that it had received 1,000 complaints regarding the HomeSafe program. On March 7, 2025, Military Times reported that, by February 28, "the Army and Air Force issued notices to their personal property shipping offices that any service members' shipments that have less than a 21-day lead time must be pulled back into the legacy system, which has been in place for more than a decade."

34.    The Federal News Network reported on May 21, 2025 that, through April 2025, only about 25% of domestic moves had been assigned to GHC and that 1,600 of those moves

11

were turned back to the legacy system due to limitations in HomeSafe's subcontract supplier base. The same Federal News Network article also stated that the Army issued an April 1 memorandum directing shipping offices to stop booking new moves under the contract until further notice and to prepare to process turn-backs of planned GHC moves to the legacy system.

35.    On May 20, 2025, the Secretary of Defense issued a publicly available memorandum titled "Immediate Modifications to the Defense Personal Property Program," which took immediate action to address "recent deficiencies in the performance of the Global Household Goods Contract," including holding HomeSafe "accountable for meeting … key performance indicators" and requiring weekly updates to the Office of the Under Secretary of Defense for Acquisition and Sustainment ("USD(A&S)") and the Office of the Under Secretary of Defense for Personnel and Readiness ("USD(P&R)"). The memorandum also directed the off-ramping of "non-serviced" HomeSafe customer shipments into the legacy Tender of Service program and required two Under Secretaries of Defense to form a task force to address the ongoing problems with HomeSafe's contract and military moves more generally.

36.    On June 19, 2025, after the market closed, HomeSafe issued a press release entitled "HomeSafe Alliance announces TRANSCOM's Notice to Terminate Global Household Goods Contract." The press release stated, in pertinent part, the following, revealing that there had been issues between TRANSCOM and HomeSafe for months:

> [HomeSafe] received on June 18, 2025, a notice from the U.S. Department of Defense's Transportation Command (TRANSCOM) **terminating the Global Household Goods Contract**, which HomeSafe won in 2021 to transform the military move system for the benefit of service members and their families.
>
> HomeSafe is confident it performed to the fullest extent possible considering the limitations placed on it. HomeSafe disagrees with TRANSCOM's justification for terminating the program.
>
> Though HomeSafe will be ceasing operations, it will first complete all moves

12

currently in progress for service members and their families.

\*        \*        \*

TRANSCOM created the Global Household Goods Contract at the direction of Congress to modernize the military move system after years of complaints from service members, their families and veterans. *HomeSafe has worked in good faith with TRANSCOM for several months to address government delays, obstacles and commercial challenges*. Indeed, as of a few weeks ago, *TRANSCOM and HomeSafe had reached an agreement to resolve these issues and move the program forward.* HomeSafe is disappointed that it did not have the opportunity to engage with the Permanent Change of Station Joint Task Force prior to the contract being terminated without warning.

From the program's start, HomeSafe also has faced staunch opposition from certain legacy movers.   HomeSafe is considering all legal options available to it.

37.    The next day, before market hours, KBR issued a press release entitled "KBR Announcement on HomeSafe Alliance Global Household Goods Contract." It stated the following:

HomeSafe Alliance, a KBR (NYSE: KBR) Joint Venture, informed us on June 18, 2025, that U.S. Transportation Command (TRANSCOM) has terminated HomeSafe's role in the Global Household Goods Contract, a contract designed to improve the moving system for military service members and their families.

We have been and will continue to work with HomeSafe to complete its obligations to TRANSCOM and the military service members and families that it serves.

38.    On September 11, 2025, the GAO released the GAO Report.

**Materially False and Misleading
Statements Issued During the Class Period**

39.    On May 6, 2025, before the market opened, KBR held its earnings call for the first quarter of 2025 (the "Q1 Call"). Defendant Bradie made the following statement on the Q1 Call:

On to slide 6. I will start with an update on our key contracts and recent wins. **Starting with HomeSafe, our contract continued to ramp during Q1, and we**

13

**saw significant operational improvement throughout the quarter. Our mission is to improve the move experience of the servicemen and women, while saving taxpayer money as we replace the inefficient and costly legacy program.**

**We are making solid progress against these objectives with customer satisfaction rising nicely.** As we move into the summer peak season, we continue to work with Transcom to synchronize moves to supplier capacity. But this synchronization is healthy for the long-term program as it emphasizes quality and timeliness of the moves first.

We accordingly expect pace of move growth to be modest in Q2 with incremental step-ups in Q3 and Q4. The HomeSafe-Transcom relationship is strong with a commitment on both sides to make this program successful.

40. The foregoing statement was misleading for failing to disclose that, at the time, the HomeSafe program was failing to meet TRANSCOM's requirements under the GHC, including failing to satisfy key performance indicators specified in HomeSafe's contract, that HomeSafe's performance was not improving throughout the quarter, and that as a result, HomeSafe was providing the government with cause to terminate the contract with HomeSafe.

41. The Q1 Call included the following exchange between Defendant Bradie and an analyst from UBS named Steven Fisher:

**Steven Fisher**: Okay. That's helpful. And then, again, not sure if I missed this, but in terms of HomeSafe, just how would you characterize the scope of the work that you're going to be capturing during the peak moving season here? And how much that could still shift around as the next few months unfold?

**Defendant Bradie:** Good question, Steve. It is seasonal, as you're aware. We said in our prepared remarks, we expect volumes in Q2 to be kind of similar to Q1 with increases going into Q3 and again into Q4. We are very happy with the performance on HomeSafe. **Again, we covered that in our prepared remarks, the customer satisfaction rates are up.** And remember, that's the primary objective is to improve the move experience for the service men and women.

The second objective is to save the taxpayers money, and we are achieving that also. So we're very happy with how things are going. The relationship with Transcom is excellent and we look forward to progressing with what is a fantastic

transformational program deploying IT at scale, using a lot of digital tools and really transforming an industry to be more efficient and more accountable as we go forward. So feeling really good about where HomeSafe sits today.

42. The foregoing statement was misleading for failing to disclose that, at the time, the HomeSafe program was failing to meet TRANSCOM's requirements, including failing to satisfy key performance indicators specified in HomeSafe's contract, that HomeSafe's performance was not improving throughout the quarter, and that as a result, HomeSafe was providing the government with cause to terminate the contract with HomeSafe. In addition, the foregoing statement failed to disclose that customer satisfaction rates excluded people whose moves were ultimately not completed by HomeSafe due to HomeSafe's inability to perform the move on time, rendering customer satisfaction a misleading metric.

43. The Q1 Call included the following exchange between Defendant Bradie and an analyst from Goldman Sachs named Jerry Revich:

> **Jerry Revich**: Hi. Stuart, can you just expand on the progress that you folks are making on HomeSafe? You mentioned improving customer satisfaction scores. Can you just quantify how that's trending? And also, can you just give us an update, please, on vendor sign-ups? How is that going relative to plan and relative to the ultimate target of moves on a multiyear basis?

> **Defendant Bradie**: **Customer satisfaction has increased to just under 90%, is the number we've achieved to date and -- but it has increased markedly over week -- over the past several weeks. The main reason for that is the adoption of the technology.** We put a lot of effort into training drivers and as well as the companies who utilize the technology. And as a consequence of that, our adoption by suppliers is increasing. At the same time, we've really put a lot of effort into our customer care service and increased the level of staffing and training from our side into that capability, and that's proving a real winner with the service men and women. We have not computers or robots that answer the phone, but real people that help them with whatever issue they may have.

> And the other part to this is that there are always issues in moving. Anyone who's at all moved on this call, I'm sure. And there's always issues, but we have settled

100% of all of the claims on time, as it relates to any discontent or anything that's been damaged, et cetera, by the movers themselves. So I think all up, I think that's what's driving the performance and customer satisfaction.

We put a lot of effort, Jerry, into synchronizing moves with Transcom and really making sure that we don't impact service members, making sure we've got the supply chain to actually execute the moves and our capacity continues to increase. And as we head into the peak season, or the busy season, or summer season as some call it, there are different dynamics during that season, and we're working daily with Transcom to make sure the right decisions are made by this for the service members. That's our priority.

So I think we are very much lockstep with Transcom. Transcom went to Congress and the HSM Service Committee [ph] recently and reaffirmed their commitment to the program and have done so publicly and politically, and we are absolutely in lockstep with them in that commitment. And as I said in my other statement, we are very confident in the future of this program.

44.     The foregoing statement was misleading for failing to disclose that, at the time, the HomeSafe program was failing to meet TRANSCOM's requirements, including failing to satisfy key performance indicators specified in HomeSafe's contract, that HomeSafe's performance was not improving throughout the quarter, and that as a result, HomeSafe was providing the government with cause to terminate the contract with HomeSafe. In addition, the foregoing statement failed to disclose that customer satisfaction rates excluded people whose moves were ultimately not completed by HomeSafe due to HomeSafe's inability to perform the move on time, rendering customer satisfaction a misleading metric.

45.     The Q1 Call included the following exchange between Defendant Bradie and an analyst from KeyBanc named Sangita Jain:

Sangita Jain: Hi, good morning. I just have a couple of brief follow-ups. On HomeSafe, should we think of the ramp as something that is entirely, as you improve your customer satisfaction and does increase moves? Or does -- is Transcom looking for some kind of a metric before they unlock more capacity for you?

16

Stuart Bradie: I believe we have performed -- we have performed really strongly in terms of the tech and the interface with TRANSCOM's tech. I think we've proven that, that works. We've proven the operation can deliver not just in terms of technology but customer satisfaction. And we've proven we can educate and train the supply chain in the way that they need to be adopters of the technology. All that is a good platform in terms of moving forward with the program and attracting more of the supply chain as we move into the rest of this year.

**There is no real metric that TRANSCOM lay down, but customer satisfaction is a key area they look at because their mission is to improve like ours, the move experience of the servicemen and women.** So that would be the one metric they look at. I think the level of synchronization we have with TRANSCOM today is really improving our ability to respond, our ability to pick up on time, deliver on time, and that all flows down to the customer satisfaction reports, of course.

So there's no real one metric or one key thing. I think it's just proving that we're committed and we're executing and that we're growing the supply chain. And as that grows, we'll do more moves.

46.     The foregoing statement was misleading for failing to disclose that, at the time, the HomeSafe program was failing to match the TRANSCOM's objectives, including failing to satisfy key performance indicators specified in HomeSafe's contract, that HomeSafe's performance was not improving throughout the quarter, and that as a result, HomeSafe was providing the government with cause to terminate the contract with HomeSafe. In addition, the foregoing statement was misleading for stating that there were no actual performance metrics laid down by TRANSCOM, when in reality TRANSCOM had specified nine key performance metrics, and that HomeSafe was failing to satisfy most of them, as set forth more fully in Paragraph 30 of the Complaint.

## THE TRUTH BEGINS TO EMERGE

47.     On June 19, 2025, after the market closed, HomeSafe issued a press release entitled "HomeSafe Alliance announces TRANSCOM's Notice to Terminate Global Household

17

Goods Contract." The press release stated, in pertinent part, the following, revealing that there had been problems between TRANSCOM and HomeSafe related to the GHC for months:

> [HomeSafe] received on June 18, 2025, a notice from the U.S. Department of Defense's Transportation Command (TRANSCOM) **terminating the Global Household Goods Contract**, which HomeSafe won in 2021 to transform the military move system for the benefit of service members and their families.
>
> HomeSafe is confident it performed to the fullest extent possible considering the limitations placed on it. HomeSafe disagrees with TRANSCOM's justification for terminating the program.
>
> Though HomeSafe will be ceasing operations, it will first complete all moves currently in progress for service members and their families.
>
> *     *     *
>
> TRANSCOM created the Global Household Goods Contract at the direction of Congress to modernize the military move system after years of complaints from service members, their families and veterans. **HomeSafe has worked in good faith with TRANSCOM for several months to address government delays, obstacles and commercial challenges**. Indeed, as of a few weeks ago, **TRANSCOM and HomeSafe had reached an agreement to resolve these issues and move the program forward.** HomeSafe is disappointed that it did not have the opportunity to engage with the Permanent Change of Station Joint Task Force prior to the contract being terminated without warning.
>
> From the program's start, HomeSafe also has faced staunch opposition from certain legacy movers.   HomeSafe is considering all legal options available to it.

48.     The next day, before market hours, KBR issued a press release entitled "KBR Announcement on HomeSafe Alliance Global Household Goods Contract." It stated the following:

> HomeSafe Alliance, a KBR (NYSE: KBR) Joint Venture, informed us on June 18, 2025, that U.S. Transportation Command (TRANSCOM) has terminated HomeSafe's role in the Global Household Goods Contract, a contract designed to improve the moving system for military service members and their families.
>
> We have been and will continue to work with HomeSafe to complete its obligations to TRANSCOM and the military service members and families that it serves.

18

49.     News that TRANSCOM had terminated the GHC caused the price of KBR stock to fall $3.85 per share, or 7.29%, to close at $48.93 on June 20, 2025. On June 23, 2025, the next trading day, news of the GHC termination caused KBR stock to fall a further $1.30, or 2.65%, to close at $47.63 on June 23, 2025.

50.     Analysts also reacted negatively to the announcement, with Morningstar noting that "the HomeSafe contract termination will make it difficult for KBR to reach its 2027 targets" and that "[w]e believe the HomeSafe cancellation is due to execution issues and poor customer satisfaction rates on that specific contract."

51.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL FACTS IN SUPPORT OF SCIENTER

### Additional Facts in Support of Bradie's Scienter

52.     As KBR's proxy solicitations in 2024 and 2025 revealed, the HomeSafe program was a significant area of personal focus for Bradie. KBR's April 1, 2024 Proxy Statement provided a positive evaluation for Bradie based in part on the fact that he "[s]upported further progress on the HomeSafe Alliance program, including through strong customer and partner engagement". The March 21, 2025 Proxy statement also states that Mr. Bradie's KPI score took into account progress on the ramp-up for the HomeSafe Alliance project. This shows Bradie's responsibility for, and close oversight and monitoring of, the HomeSafe Program.

53.     On May 6, 2025, KBR caused the Company to file a Form 8-K furnishing its first quarter fiscal 2025 earnings release, which touted HomeSafe's ramp and "rising customer satisfaction scores," and otherwise affirmatively highlighted HomeSafe's progress as part of KBR's quarterly narrative to investors. That same day, KBR filed its Quarterly Report on Form

19

10-Q for the quarter ended April 4, 2025. The Form 10-Q expressly included HomeSafe-related operational impacts as a driver of KBR's revenue growth during the quarter, underscoring that HomeSafe and the GHC were a sufficiently material part of KBR's business to be discussed in KBR's SEC-filed Management's Discussion and Analysis.

54.    Further supporting Bradie's scienter is his May 6, 2025 statements minimizing or denying the existence of objective performance metrics governing HomeSafe's ramp and TRANSCOM's decisions. In fact, TRANSCOM's performance monitoring process for the GHC included monitoring nine key performance indicators defined in the contract, including metrics for timeliness of shipment scheduling, pickup, and delivery, and customer satisfaction, and TRANSCOM measured contractor performance on these KPIs at least monthly. From January through June 2025, the contractor failed to meet defined performance thresholds for most KPIs, including picking up only approximately 64% of shipments on time and delivering only approximately 58% of shipments on time. Given Bradie's detailed and repeated commentary about HomeSafe performance and ramp dynamics to investors, and the formal, contract-defined, monthly-tracked KPI regime governing the program, Bradie's downplaying of performance metrics supports a strong inference that he was aware of the KPI framework and adverse KPI results, or at minimum acted with severe recklessness in making statements inconsistent with those core contractual facts.

55.    KBR's own SEC filings and investor communications during the Class Period confirm that HomeSafe was not a peripheral initiative, but a material, closely monitored operational driver for its business. In KBR's May 6, 2025 earnings release, the Company highlighted that HomeSafe move volumes continued to ramp and pointed to rising customer satisfaction scores, presenting HomeSafe as a notable program milestone alongside KBR's

major operational priorities. KBR's May 6, 2025 Form 10-Q likewise identified moves associated with HomeSafe as a contributor to KBR's quarter-over-quarter revenue growth. By attributing revenue growth to HomeSafe-related activity in an SEC-filed report, Bradie confirmed HomeSafe's materiality to KBR's reported results and investor story. This core operations context supports a strong inference that Bradie was aware of, or was deliberately reckless in ignoring, HomeSafe's ongoing capacity shortages, performance failures, and escalating governmental scrutiny at the time they told investors that HomeSafe was experiencing significant operational improvement, that customer satisfaction was rising, and that the HomeSafe–TRANSCOM relationship was strong.

56.    HomeSafe's execution of the GHC—and the risk that HomeSafe was failing KPIs, lacked sufficient moving-industry capacity, and faced potential termination—presented an obvious strategic, operational, and reputational risk to KBR, particularly given that KBR consolidated HomeSafe and publicly emphasized HomeSafe as a growth initiative. This makes it implausible that Bradie was unaware of the severity of HomeSafe's performance and capacity issues when he made the misleading Class Period statements, or when they failed to correct them as events unfolded.

57.    The magnitude and duration of HomeSafe's failures, combined with the government's contemporaneous monitoring, further support a strong inference of scienter. Out of approximately 20,000 shipments initiated with the GHC contractor from April 2024 through June 2025, TRANSCOM officials terminated 7,400 orders due to the contractor's failure to meet performance requirements or lack of capacity to manage the shipments. At the contractor's request in early 2025, thousands of shipments that had been assigned to the contractor were moved back into the legacy Tender of Service program. TRANSCOM officials also stated that

although the contractor had represented it could manage approximately 200,000 shipments per year, it could not successfully execute the roughly 20,000 shipments it was assigned. These facts demonstrate acute capacity shortfalls and systemic performance breakdowns.

58.     TRANSCOM measured performance on contract-defined KPIs at least monthly, and from January through June 2025, the contractor failed to meet defined performance thresholds for most KPIs, including timely pickup and delivery. These were severe, systemic, and measurable failures in a program KBR publicly described as improving and being in lockstep with TRANSCOM. The scale of shipment terminations, turn-backs, and KPI failures makes it far more plausible than not that Defendants knew the true operational reality, or were at least deliberately reckless in disregarding it, when they reassured investors about operational improvement, customer satisfaction, and relationship strength.

59.     Bradie's repeated reliance on customer satisfaction metrics as purported proof of HomeSafe's success further supports scienter because the satisfaction measurement was structurally incomplete in a way that concealed the program's most serious failures. Under the GHC, service members received customer satisfaction surveys after completing stages of their moves. However, service members did not receive a survey when the contractor failed to carry out or complete a specific stage of a move. For example, if a move was never picked up by the contractor and instead was transferred back into the legacy system, the service member would not receive a survey regarding the contractor's pickup services. This failure to survey customers who experienced such breakdowns limited feedback on the full range of experiences and left TRANSCOM less able to evaluate overall customer satisfaction. Despite this structural exclusion of the very customers whose moves were canceled, turned back, or never picked up, Defendants repeatedly touted customer satisfaction as a primary objective and evidence of

22

operational improvement and program health. Given Defendants' detailed commentary about capacity synchronization and their oversight obligations under KBR's disclosure controls, Bradie either knew, or was deliberately reckless in not knowing, that the customer satisfaction figures he presented to investors were materially incomplete and misleading because they excluded a large subset of the most negatively impacted service members and families.

60.    Further supporting Bradie's scienter is the extraordinary level of government intervention during the Class Period, reflecting pervasive and escalating deficiencies in the GHC program and putting Bradie on notice well before the June 18 termination notice. On May 20, 2025, the Secretary of Defense issued a memorandum citing recent deficiencies in the performance of the Global Household Goods Contract and directing USTRANSCOM to hold the GHC accountable for meeting key performance indicators and to provide weekly updates to senior Department offices. The memorandum also directed that non-serviced GHC customer shipments be off-ramped into the legacy program based on capacity shortfalls and required senior Department officials to form a task force to act decisively to improve, expand, terminate, or transfer GHC or legacy program responsibilities as needed. Such high-level intervention is inconsistent with a benign ramp experiencing significant operational improvement and a strong relationship, as Bradie told investors on May 6, 2025. Rather, it is consistent with a program in crisis and facing imminent structural change or termination. The Secretary of Defense's directives, issued weeks before the termination notice and during the Class Period, support a strong inference that Bradie knew, or was severely reckless in not knowing, that HomeSafe's performance and capacity issues were acute, escalating, and placed the GHC at serious risk, rendering Defendants' assurances misleading.

23

61. Bradie's stock sales demonstrate a motive to commit fraud. On June 18, 2025, Bradie sold 20,000 shares at $52.8123 for total proceeds of $1,056,246, without a 10b5-1 trading plan. Other than sales to cover taxes on vesting of options, this was Bradie's only sale of KBR stock during his tenure as CEO other than a single sale of 900 shares of stock on May 23, 2023.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

62. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired KBR securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of KBR, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

63. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, KBR securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

64. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

24

65.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

66.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of KBR;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused KBR to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of KBR securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

67.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

25

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

68.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- KBR shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;

- As a public issuer, KBR filed periodic public reports;

- KBR regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- KBR's securities were liquid and traded with 1.3 million shares traded on average during the Class Period; and

- KBR was followed by at least 13 securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

69.    Based on the foregoing, the market for KBR securities promptly digested current information regarding KBR from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against Defendants KBR and Bradie

70.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     This Count is asserted against Defendants KBR and Bradie (the "Primary Violation Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

72.     During the Class Period, Primary Violation Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     Primary Violation Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74.     Primary Violation Defendants acted with scienter in that the challenged public documents and statements issued or disseminated in KBR's name were materially false and misleading, the persons who made, signed, reviewed, approved, and/or disseminated those statements knew or were severely reckless in not knowing that they were misleading, and those statements were communicated to the investing public.

75.     Bradie, who is a senior officer and director of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when he failed to ascertain and disclose the true facts in the statements made by him or other KBR personnel to members of the investing public, including Plaintiff and the Class.

76. As a result of the foregoing, the market price of KBR securities was artificially inflated during the Class Period. In ignorance of the falsity of Primary Violation Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of KBR securities during the Class Period in purchasing KBR securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

77. Had Plaintiff and the other members of the Class been aware that the market price of KBR securities had been artificially and falsely inflated by the Primary Violation Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased KBR securities at the artificially inflated prices that they did, or at all.

78. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

79. Plaintiff and the Class did not discover, and could not have discovered through reasonable diligence, the facts constituting the violations alleged herein until June 19, 2025.

80. By reason of the foregoing, Primary Violation Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of KBR securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

81. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

28

82.     During the Class Period, the Individual Defendants participated in the operation and management of KBR, and conducted and participated, directly and indirectly, in the conduct of KBR's business affairs. Because of their senior positions, they knew adverse non-public information about KBR's business practices.

83.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to KBR's financial condition and results of operations, and to correct promptly any public statements issued by KBR that had become materially false or misleading.

84.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that KBR disseminated in the marketplace during the Class Period concerning KBR's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause KBR to engage in the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" of KBR within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged herein, which artificially inflated the market price of KBR securities.

85.     Plaintiff and the Class did not discover, and could not have discovered through reasonable diligence, the facts constituting the violations alleged herein until June 19, 2025.

86.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by KBR.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

29

(a)　declaring this action to be a proper class action, designating plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)　awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)　awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)　awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: March 19, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Phillip Kim*
Phillip Kim, Esq., attorney-in-charge
Bar Number: 1036827
Laurence M. Rosen, Esq. (*pro hac vice*)
Jonathan Stern (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
　　　　lrosen@rosenlegal.com
　　　　jstern@rosenlegal.com

*Counsel for Plaintiff*

30

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of March 2026, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Phillip Kim*
Phillip Kim